**SO ORDERED.**

**SIGNED this 23 day of October, 2012.**

_____
**Randy D. Doub
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:

| | |
|---|---|
| **MAINLINE CONTRACTING, INC.,** | **CHAPTER 7** |
| | **CASE NUMBER: 09-07927-8-RDD** |
| **DEBTOR** | |

| | |
|---|---|
| **RICHARD D. SPARKMAN, Trustee,** | **ADVERSARY PROCEEDING** |
| | **NUMBER: 11-00040-8-RDD** |
| **Plaintiff** | |
| v. | |
| **MARTIN MARIETTA MATERIALS, INC.,** | |
| **Defendant** | |

### ORDER DENYING TRUSTEE'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pending before the Court is the Plaintiff's Motion for Summary Judgment, filed by Richard D. Sparkman (the "Trustee") on April 25, 2012 (the "Trustee's Motion"); the Response of Martin Marietta Materials, Inc. to Plaintiff's Motion for Summary Judgment filed by Martin Marietta Materials, Inc. (the "Defendant") on May 16, 2012 (the "Defendant's Response"); Martin Marietta

Materials, Inc.'s Motion for Summary Judgment filed by the Defendant on April 27, 2012 (the "Defendant's Motion"); the Plaintiff's Memorandum of Law in Response and Opposition to Defendant's Motion for Summary Judgment filed by the Trustee on May 18, 2012 (the "Trustee's Response"); Martin Marietta Materials, Inc.'s Reply to Plaintiff's Response to its Motion for Summary Judgement filed by the Defendant on June 1, 2012; and the memoranda of law related to each. The Court conducted a hearing in Wilson, North Carolina on September 18, 2012 to consider these matters.

## JURISDICTION

Subject matter jurisdiction and jurisdiction over the parties exists pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference of the United States District Court for the Eastern District of North Carolina dated August 3, 1984.

This matter is a core proceeding as set forth in Section 157(b)(2) of Title 28 of the United States Code.

## STANDARD FOR SUMMARY JUDGMENT

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In making this determination, conflicts are resolved by viewing all facts and all reasonable inferences in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). If there is no genuine issue of material fact, and the issue to be decided is a matter of law, a ruling on a motion for summary judgment is appropriate. However, if there are genuine issues of material fact, then summary judgment is not appropriate.

**FACTUAL HISTORY**

Mainline Contracting, Inc. (the "Debtor") filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code on September 15, 2009. The Debtor's Chapter 11 case was converted to a case under Chapter 7 and the Trustee was appointed by an order entered on October 15, 2009. The Trustee initiated this adversary proceeding on January 28, 2011 by filing the Complaint to Avoid and Recover Preferences or Fraudulent Transfers (the "Complaint"). In the Complaint, the Trustee seeks to avoid several alleged preferential transfers made within the ninety (90) days prior to the petition date pursuant to 11 U.S.C. § 547 and recover the funds for the benefit of the estate pursuant to 11 U.S.C. §§ 550, 551. In the event the Trustee is unable to recover under a theory of preferential transfers as provided by § 547, the Complaint also seeks to recover under the theory of fraudulent transfer pursuant to 11 U.S.C. § 548.

The Debtor formed as a North Carolina corporation on January 13, 1999.[1] The Debtor was in the construction industry, primarily performing site development on public and private construction projects, including highways, schools, airports, hospitals, private residences, and shopping centers. The Debtor generally operated as a general contractor, developing sites for property owners, but occasionally did work as a subcontractor as well. As a requirement for many of its jobs, the Debtor contracted with various vendors and material suppliers, including the Defendant, to obtain asphalt, concrete, and other aggregate materials for its site development projects. The Debtor used the Defendant as a vendor for its projects from 1999 until it ceased

---

[1] The Debtor filed articles of incorporation with the North Carolina Department of the Secretary of State on January 13, 1999 naming Randy Garrett as its registered agent. Mr. Garrett served as the President of the Debtor during its operation.

operations after converting its case to Chapter 7. However, there is little evidence of the Debtor and the Defendant's business relationship prior to 2007.

In the fall of 2008, the Debtor began experiencing financial difficulty as a result of the general downturn of the economy and the construction industry in particular. According to the deposition testimony of Gina C. Moore, Chief Financial Officer of the Debtor, a number of things caused the Debtor to file the bankruptcy petition, including the economy, the inability to sell equipment to reduce debt servicing, and several projects that the Debtor was never paid for. Moore Dep. 67, Feb. 27, 2012. In addition, several of the Debtor's bonding companies increased the ratio requirements for the level of bonding the Debtor typically always carried while the number of jobs decreased. Garret Dep. 24:1-24:7, Nov. 8, 2011. All of these factors combined contributed to the filing of the bankruptcy petition.

The Defendant was one of the Debtor's primary vendors until the filing of the bankruptcy petition. Generally, when the Defendant invoiced the Debtor for materials sold, the invoice included the term "net 30 days," meaning the entire balance was due within thirty (30) days from the billing date. Moore Dep. 38:19-25. However, "net 30" terms were often impracticable because it was rare for the Debtor to be paid for its work by project owners or general contractors within thirty (30) days. *Id*. at 39:5-6. The Debtor rarely, if ever, paid the Defendant's invoices within thirty (30) days. Garrett Dep. 29:25-30:1. Thus, the Debtor generally operated on "pay when paid" terms, whereby it would pay suppliers when it was paid for a particular project the materials were used on, as is typical in the construction industry. *Id*. at 42:22-43:13. In fact, it was not uncommon for the Debtor to pay the Defendant's invoices sixty (60) days or more late. Brye Dep. 66:9-15, Feb. 13, 2012. Further, from analysis of the payments the Defendant received from the Debtor between July 16,

4

2007 to June 16, 2009, the average number of days from date of invoice to date of payment was seventy-nine (79) days.

In the year prior to the petition date, the Debtor's finances became more troubled, causing more sporadic payment to the Defendant. The Debtor's former controller, Rick Brye, stated in his deposition that finances got so bad that the Debtor never paid the Defendant's invoices before ninety (90) days past due or until the Defendant called to inquire about payment. Brye Dep. 37:2-10. Frank Kessler, the Defendant's credit manager, stated it was his goal to make sure the Debtor was current within sixty (60) days of the invoice date. Kessler Dep. 8:19-23, 16:5-7, Feb. 27, 2012. However, the Debtor's account was over sixty (60) days past due on several occasions. In those instances, the Defendant would contact the Debtor, usually by telephone but occasionally by email to determine if the account would be brought current. *Id*. 10:18-25. If payment was not forthcoming, Mr. Kessler would discuss the account with the account's sales manager and determine whether it should be placed on cash on delivery ("COD") terms.[2] *Id*. 14:7-16. Generally, if a customer was placed on COD terms, the Defendant would not provide quotes for materials needed for future jobs. *Id*. 14:25-15:7.

On multiple occasions prior to the petition date, the Defendant placed the Debtor's account on COD terms. The first instance occurred on October 29, 2008, when the Debtor's account was placed on COD after the Debtor failed to make payment for invoices from August 2008. Kessler Aff. ¶ 18; Ex. FF. On October 30, 2008, the Debtor made a payment of $64,495.46 and was removed from COD terms. Kessler Aff. ¶ 18; Ex. FF. Again at the end of December 2008, the Defendant placed the Debtor on COD terms for failure to pay invoices from October 2008 that were

---

[2] Mr. Kessler stated that cash on delivery meant a customer would be required to provide payment at the time of purchasing any materials. Kessler Dep. 14:23-24.

5

at least sixty (60) days past due. Kessler Aff. ¶ 19. The Debtor issued four (4) checks on December 30, 2008 and one (1) check on December 31, 2008 totaling $93,033.84 and its account was removed from COD terms on January 2, 2009. *Id*. ¶ 18, 20; Ex. FF. Threats of COD treatment were pending on other occasions. For instance, at the end of April 2009, Mr. Kessler and Mr. Brye engaged in conversation via email regarding payment for invoices sent in February 2009. Kessler Aff. ¶ 21; Ex. HH. The Debtor's account was not placed on COD terms because it made a payment in the amount of $93,033.84 on April 29, 2009. Kessler Aff. ¶ 22. However, from these transactions it becomes clear the Defendant contacted the Debtor when its accounts receivable went past sixty (60) days due, attempted to determine when the Debtor would make payment, and if payment would not be made in an agreeable time, placed the Debtor's account on COD terms.

In the Complaint, the Trustee seeks to recover five (5) payments for materials made by the Debtor to the Defendant within ninety (90) days before the date of the filing of the petition, pursuant to 11 U.S.C. § 547.[3] The ninety (90) day period for which preferential transfers may be recovered spans from June 17, 2009 to September 15, 2009 (the "Preference Period"). All other transactions between the Debtor and the Defendant prior to June 17, 2009 make up the baseline of dealing (the "Baseline Period").[4] The Trustee asserts the Debtor made the five (5) payments (hereinafter the "Transfers") in June and July 2009, totaling $506,056.18, which constitute preferences that the

---

[3]In addition to a claim for relief pursuant to 11 U.S.C. § 547, the Complaint sets forth a claim for relief for recovery of fraudulent transfers pursuant to 11 U.S.C. § 548. However, neither the Trustee's Motion nor the Defendant's Motion address summary judgment on 11 U.S.C. § 548.

[4]In this case, the parties have produced evidence of transactions dating back to July 16, 2007. Therefore, the Baseline Period encompasses all transactions between July 16, 2007 to June 16, 2009.

Trustee is entitled to recover on behalf of the bankruptcy estate under 11 U.S.C. §§ 547, 550. The Transfers are as follows:

| Check Date | Check Number | Amount | Check Cleared |
|---|---|---|---|
| June 26, 2009 | 34008 | $7,456.49 | June 30, 2009 |
| June 26, 2009 | 34009 | $222,326.95 | June 30, 2009 |
| June 26, 2009 | 34010 | $573.66 | June 30, 2009 |
| July 31, 2009 | 34432 | $878.61 | July 31, 2009 |
| July 31, 2009 | 34433 | $274,820.47 | July 31, 2009 |
| | | $506,056.18 | |

The evidence presented by the parties suggests that prior to making the Transfers, the Defendant contacted the Debtor by email requesting payment for invoices more than sixty (60) days past due. Specifically, on June 22, 2009, Mr. Kessler sent Mr. Brye an email requesting payment in the amount of $234,656.00 for April 2009 invoices and indicated the Debtor owed a total of $716,359.00. Ex. BB. Mr. Kessler emailed Mr. Brye again on June 25, 2009, requesting the payment be made on the next day. *Id*. Though the emails contained no threat of placing the account on COD terms, it was understood between the parties that if payment was not made, the Defendant would stop supplying materials on credit. On June 26, 2009, the Debtor wrote three (3) checks to the Defendant totaling $230,357.95. Ex. M-O. Approximately one month later, on July 31, 2009, Mr. Kessler emailed Mr. Brye again inquiring about payment. Ex. DD. On the same day, one of the Defendant's employees picked up two (2) checks from the Debtor totaling $275,669.08. Ex. P-Q. The Debtor made no other payments to the Defendant during the Preference Period. The average number of days from date of invoice until the date that payment was received during the Preference Period was approximately seventy-nine (79) days.

The Trustee's Motion argues summary judgment for the Trustee is proper because all the elements of § 547(b) are met. Specifically, the Trustee asserts (1) there was a transfer of an interest of the property of the Debtor; (2) to the Defendant; (3) on account of an antecedent debt owed by the Debtor; (4) made while the Debtor was insolvent; (5) within ninety (90) days before filing the petition; and (6) the Defendant received more than it would have if the case was a case under Chapter 7, if the transfer had not been made, and if the Defendant received payment to the extent provided by the Bankruptcy Code. Further, the Trustee's Motion concedes the Defendant may apply the new value defense pursuant to § 547(c)(4), but only to the extent of $91,466.67, reducing the Defendant's preference exposure for the Transfers to $414,589.51. The Trustee asserts no other defenses apply to the § 547 cause of action. Therefore, the Trustee contends he is entitled to judgment as a matter of law in the amount of $414,589.51.

In the Defendant's Response, the Defendant asserts the Trustee is not entitled to judgment as a matter of law. The Defendant narrows the issues to whether the statutory exceptions of § 547(c)(2), (4) apply and to what extent those exceptions apply. The Defendant asserts it is entitled to the protection provided by § 547(c)(2) because the Transfers were made in the ordinary course of business between the Debtor and the Defendant. The Defendant states the Transfers made during the Preference Period were not unusual in nature or amount from payments made during the Baseline Period. Further, the Defendant argues the collection activities that occurred during the Preference Period were no different than those that occurred during the Baseline Period. Accordingly, the Defendant argues § 547(c)(2) applies in this case and the Trustee is not entitled to judgment as a matter of law.[5]

---

[5] In the Defendant's Response, the Defendant also argued the new value defense provided by § 547(c)(4) reduced the Defendant's preference exposure from $506,056.18 to $374,709.54.

In the Defendant's Motion, the Defendant states that to be considered a preferential transfer, the Transfers must meet all the elements of a preference under § 547(b) and there must be no applicable statutory defense. The Defendant further asserts that in this case, the new value and ordinary course of business defenses provided by § 547(c)(2), (4) are applicable.[6] Specifically, the Defendant argues the Transfers were on account of a debt incurred by the Debtor and the Defendant in the ordinary course of business and the Transfers were made within the ordinary course of business between the Debtor and the Defendant. The Defendant claims its treatment of the Debtor during the Preference Period was no different or unusual from its treatment of the Debtor during the Baseline Period. Finally, the Defendant asserts the Transfers were made according to ordinary business terms standard for the construction supply industry. As such the Defendant states the ordinary course of business defense applies, entitling it to judgment as a matter of law.

In the Trustee's Response, the Trustee asserts the Defendant is not entitled to a defense under § 547(c)(2) because the Transfers were made outside the ordinary course of business of the Debtor and the Defendant. The Trustee contends the amounts of the Transfers and the timing of the Transfers caused them to fall outside the ordinary course of business between the Debtor and the Defendant. Further, the Trustee argues the Defendant's actions constituted unusual collection activity through the use of economic pressure as a critical vendor, which places the Transfers outside of the ordinary course of business between the parties. Finally, the Trustee asserts the Transfers were

---

At the hearing, the Defendant stated it had no evidence to support its contention of additional new value provided. Therefore, the Defendant stipulated its preference exposure should be reduced to $414,589.51 on account of new value, as suggested by the Trustee.

[6] As the Defendant stipulated to the Trustee's calculations of the reduction of preference exposure based on the new value defense, the Court shall not consider the application of § 547(c)(4) above and beyond the stipulated new value defense.

made outside ordinary business terms based on the contractor industry. As such, the Trustee argues the Defendant is not entitled to judgment as a matter of law.

The Defendant rebuts the assertions in the Trustee's Response by arguing the amount of the Transfers was customary between the parties and was based on the increased number of projects during the spring and summer months. Additionally, the timing of the Transfers was not unusual as the Defendant typically inquired about payment at the end of each month and the average number of days between invoices and payment for both the Baseline and Preference Periods was seventy-nine (79) days. Further, the Defendant asserts it was not aware of its status as a critical vendor of the Debtor and there is no evidentiary foundation for the Trustee's allegations of economic pressure.

## DISCUSSION

The Trustee seeks to avoid as preferences the five (5) payments made by the Debtor to the Defendant. Section 547(b) of the Bankruptcy Code provides that the trustee may avoid certain preferential transfers of an interest of the debtor in property made by the debtor to certain creditors. To avoid the transfers, the trustee must establish the transfers (1) were to or for the benefit of a creditor; (2) were for or on account of an antecedent debt; (3) were made while the debtor was insolvent; (4) were made within ninety (90) days before filing of the debtor's bankruptcy petition; and (5) enable the creditor to receive more than it would receive if the transfers had not been made. 11 U.S.C. § 547(b); *Sparkman v. Johnson Concrete Co. (In re Mainline Contracting, Inc.)*, No. 11-00262-8-RDD, 2012 WL 2373666, at *1 (Bankr. E.D.N.C. June 22, 2012).

The Trustee bears the burden of proving the avoidability of the transfers pursuant to 11 U.S.C. § 547(b). However, the Defendant raises no objection to the assertion that the Transfers were transfers of the Debtor's interest in property for the Defendant's benefit on account of an antecedent debt, made while the Debtor was insolvent, within the ninety (90) days before the petition date, and

enabled the Defendant to receive more than it would have otherwise. As such, the parties narrow the issue to whether the Transfers are protected from the Trustee's avoidance powers by § 547(c)(2). Resp. of Martin Marietta Materials, Inc., to Pls.' Mot. for Summ. J. 2.

The Trustee concedes the debts were *incurred* in the ordinary course of business or financial affairs between the Debtor and the Defendant pursuant to the initial requirement of § 547(c)(2). Pl.'s Mem. Of Law in Resp. And Opp'n to Def.'s Mot. For Summ. J. 7. Therefore, all that remains for this Court to decide is whether the transfers were made in the ordinary course of business or financial affairs of the Debtor and the Defendant pursuant to § 547(c)(2)(A) *or* made according to ordinary business terms pursuant to § 547(c)(2)(B).[7]

The Bankruptcy Code exempts certain transfers from the Trustee's power of avoidance. *Sparkman*, 2012 WL 2373666, at *3; *see* § 547(c)(1)-(5). "In the summary judgment context, the moving party must demonstrate that there are no genuine issues of material fact regarding its entitlement to one of the exceptions." *Sparkman*, 2012 WL 2373666, at *3 (citing *Simon v. Gerdau MacSteel, Inc. (In re Am. Camshaft Specialties, Inc.)*, 444 B.R. 347, 352 (Bankr. E.D. Mich. 2011)). Section 547(c)(2) provides the trustee may not avoid a transfer,

> (2)   to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was–
> > (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
> > (B) made according to ordinary business terms.

---

[7]Section 547(c)(2) was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109-8, 119 Stat. 23, § 409. Prior to the amendment, the now separate defenses of § 547(c)(2)(A) and § 547(c)(2)(B) were dual components of a single defense. *Hutson v. Branch Banking & Trust Co. (In re Nat'l Gas Distrib., LLC)*, 346 B.R. 394, 396 (Bankr. E.D.N.C. 2006).

11 U.S.C. § 547(c)(2). In determining whether payments were made in the ordinary course of business under § 547(c)(2), Courts must engage in a "peculiarly factual" analysis. *Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Grp., Inc.)*, 956 F.2d 479, 486 (4th Cir. 1992). The "creditor . . . against whom recovery or avoidance is sought has the burden of proving the nonavoidability" under § 547(c). 11 U.S.C. § 547(g).

Factors courts consider when determining whether payments are ordinary between the parties include: "(1) the length of time the parties were engaged in the transaction at issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) the circumstances under which the payment was made." *Sparkman*, 2012 WL 2373666, at *7 (citing 5 Collier on Bankruptcy (16th ed. rev.) ¶ 547.04[2][a][ii]).

After review of the affidavits, depositions, admissions, and other evidence on record, the Court finds the Defendant is entitled to the statutory defense provided by § 547(c)(2) because the Transfers were made in the ordinary course of business or financial affairs of the Debtor and the Defendant. There being no genuine issue of material fact remaining, the Defendant is entitled to summary judgment as a matter of law.

The evidence presented to the Court overwhelmingly demonstrates the transfers occurred in the ordinary course of business between the Debtor and the Defendant. The Baseline Period establishes the course of business between the parties. During the Baseline Period, it is clear that the Defendant would provide materials to the Debtor on credit. The Defendant then sent invoices to the Debtor for materials that included "net 30" payment terms. The evidence indicates the Debtor rarely, if ever, paid the invoices in full within thirty (30) days as suggested by the invoice terms. However, the Defendant continued to supply the Debtor materials on credit provided that the

invoices were paid within sixty (60) to ninety (90) days from the invoice date. During the Baseline Period, the Debtor made no payment to the Defendant earlier than two (2) months from the invoice date. The number of days from the date of invoice to the date payment was received averaged seventy-nine (79) days. When the invoices approached the sixty (60) day mark, the Defendant, through its credit manager Frank Kessler, would either call or email Rick Brye, the Debtor's controller, concerning necessary payments. Generally, the parties would discuss when payment would be made and if it was not forthcoming within a time deemed appropriate by the Defendant, the Defendant would elect to place the Debtor's account on COD payment terms. The Defendant placed the Debtor's account on COD terms on at least two occasions during the Baseline Period (October and December 2008) and threatened to require COD at least one additional time (April 2009). Once the Debtor paid the invoices, the Defendant removed its account from COD payment terms and continued to supply the Debtor with materials on credit.

During the Preference Period, the Defendant took the same measures to collect on accounts receivable that it took during the Baseline Period. The evidence shows on June 22, 2009 and again on June 25, 2009, Mr. Kessler emailed Mr. Brye concerning payments for purchases made in April 2009. Ex. BB. Again on July 31, 2009, Mr. Kessler contacted Mr. Brye via email concerning payment for May 2009 purchases. Ex. DD. As it had on many occasions during the Baseline Period, the Debtor issued a check to the Defendant within a few days after receiving the email requests for payment. There was no evidence that the Defendant called the Debtor prior to these payments or took steps outside of its normal course of dealings in order to collect payments. Therefore, the Court finds no disparity in the parties' dealings during the Preference Period and the Baseline Period.

The Court is unable to reach any different conclusion after analysis of the facts under the four factor test. The Court's analysis includes:

1.      **The Length of Time the Parties Were Engaged in the Transaction at Issue**

The Debtor and the Defendant have engaged in business together since the Debtor incorporated in 1999. During that time, the Defendant supplied the Debtor with aggregates and other materials used in site development in the construction industry. The evidence of transactional history during the Baseline Period extends two (2) years prior to the date of the Transfers. The Court finds this is a significant period of time to compare the manner in which the Debtor and the Defendant conducted business.

2.      **Whether the Amount or Form of Tender Differed From Past Practices**

The Trustee argues that the timing of the payments were not in the ordinary course of business between the Debtor and the Defendant. The Trustee asserts the payment terms on the Defendant's invoices were "net 30 days" and that the Debtor never made payment within thirty (30) days of an invoice. However, a payment made beyond contract or invoice terms "may still be considered in the ordinary course . . . if the late payments were the standard course of dealing between the parties." 5 Collier on Bankruptcy (16th ed. rev.) ¶ 547.04[2][a][ii]. "Normally, if late payments were the standard course of dealing between the parties, they shall be considered within the ordinary course of business under section 547(c)(2)." *Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.)*, 888 F.2d 42, 44 (6th Cir. 1989) (citing *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 872 F.2d 739, 743 (6th Cir. 1989)). The evidence shows that the average number of days from invoice date to payment date during both the Baseline Period and the Preference Period was seventy-nine (79) days. For the seventy-nine (79) days to be equal both during the Baseline and Preference Periods is more than just a coincidence, but is clear proof there

is no genuine issue of material fact. Therefore, the Court finds it was ordinary for the debtor to make payments to the Defendant outside of the "net 30 day" terms as set by the invoices.

The Trustee also asserts the amount of the Transfers exceeds the normal and customary amount of payments made to the Defendant during the Baseline Period. The two (2) largest checks included in the Transfers were both over $200,000.00 each. The Trustee argues that because there were no payments this large made during the Baseline Period, the Transfers were not in the ordinary course of business. However, during the Baseline Period, the Debtor made several substantially large payments to the Defendant, including one for the months of July through September in November 2007 totaling $236,084.60.[8] Additionally, during the Baseline Period, the Debtor made significant cumulative payments in the amount of $95,196.44 in April 2008, $116,170.50 in June 2008, $197,751.05 in August 2008, and $235,656.58 in October 2008. Thus, while individual payments during the Baseline Period may appear much smaller, monthly totals indicate payments similar to this size were in the ordinary course between the Debtor and the Defendant. Further, the Defendant provided reasonable explanations for the higher amount of the payments, including increased demand for aggregate materials during warmer months and the proximity of certain jobs to the Defendant's plants. Kessler Aff. ¶ 28; Brye Dep. 54:3-8. Additionally, it appears to the Court that other vendors stopped supplying the Debtor in the Spring of 2009, requiring it to order more materials from the Defendant, who continued to supply aggregate materials. Therefore, the Court finds the amount of payments to be in the ordinary course of business between the Debtor and the Defendant.

---

[8]On November 27, 2007, the Defendant received a check in the amount of $236,084.60 for materials delivered between July and September 2007.

**3.     Whether the Debtor or Creditor Engaged in any Unusual Collection or Payment Activity**

The Trustee alleges the phone calls and emails made by the Defendant to the Debtor constitute unusual collection activity. A "collection activity is considered unusual if it is differs [sic] from actions taken in the pre-preference period." *U.S. Bank Nat'l Ass'n v. Spectra Mktg. Sys., Inc. (In re Interstate Bakeries Corp.)*, No. 09-4177, 2011 WL 96815, at *4 (Bankr. W.D. Mo. Jan. 12, 2011). The evidence suggests that the Defendant, on occasion, called and emailed employees of the Debtor to inquire as to when and if payment on outstanding invoices would be made. The phone calls and emails occurred during both the Preference and Baseline Periods as the Defendant attempted to keep the Debtor on an approximate sixty (60) day past due payment schedule. There is no evidence to suggest that the phone calls or emails increased during the Preference Period. "These activities were routine over the [parties' relationship], and Defendant's collection activities did not increase during the preference period." *Grant v. SunTrust Bank, Cent. Fla., N.A. (In re L. Bee Furniture Co., Inc.)*, 203 B.R. 778, 783 (Bankr. M.D. Fla. 1996) (holding phone calls from a creditor after sending invoices and past due notices were routine and in the ordinary course of business throughout the parties relationship); *Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728, 738 (Bankr. W.D. Va. 1995) (finding evidence that a creditor routinely made phone calls encouraging payment between 45 and 60 days after the invoice date were standard means of collection). Therefore, the Court finds the Defendant's phone calls and emails did not constitute unusual collection activity as the phone calls and emails were ordinary between the parties during the Baseline Period.

**4.      The Circumstances Under Which the Payment was Made**

While the Defendant's phone calls and emails to the Debtor may not have been unusual, the Trustee argues the circumstances surrounding payment was out of the ordinary course of business between the Debtor and the Defendant. The Trustee asserts that the Defendant was aware of the Debtor's financial difficulties leading up and into the Preference Period and used its position as a critical vendor to elicit the Transfers. The Trustee claims the Defendant knew other vendors refused to supply the Debtor with aggregates and other materials on credit, making the Debtor dependent on the Defendant. As such, the Trustee alleges the Defendant used this leverage against the Debtor by threatening to place its account on COD terms. If the Debtor's account was on COD terms, the Defendant would not quote any new jobs and the Debtor would have to pay for all materials prior to receiving payment from the job owner. Thus, the Trustee's main argument requires the Court to find the Debtor made the Transfers as a result of the Defendant's threats to enforce COD terms and eliminate material supply on credit.

The Defendant's actions did not rise to the level of economic threat sufficient to remove the Transfers from the ordinary course of business between the Debtor and the Defendant. The Trustee is correct in asserting the Court should consider "whether the [p]ayment to the [creditor] was made in response to unusual collection efforts." *Menotte v. Oxyde Chem. Inc. (In re JSL Chem. Corp.)*, 424 B.R. 573, 581 (Bankr. S.D. Fla. 2010) (stating when evidence of of unusual collection efforts is present, the bankruptcy court must consider whether the debtor's payment was in response to those efforts). However, courts are split on the issue of whether conditioning shipment of product constitutes unusual collection activity rendering transfers outside the ordinary course of business. *Compare Rifken v. Entec Distrib., LLC (In re Felt Mfg. Co., Inc.)*, No. 07-1170-JMD, 2009 WL

3348300 (Bankr. D.N.H. 2009) (explaining the parties deviated from ordinary practices by entering into an agreement whereby the supplier delivered goods to the debtor but retained possession until the debtor made payment for the goods and received express consent of the supplier to use them), *and Menotte v. Oxyde Chem. Inc.*, 424 B.R. 573 (finding a threat to place debtor on "credit hold," even prior to the preference period, precluded the application of the ordinary course of business defense where creditor did not routinely inform the debtor's officers of the "credit hold"), *with Miller v. Westfield Steel, Inc. (In re Elrod Holding Corp.)*, 426 B.R. 106 (Bankr. D. Del. 2010) (finding a creator's threats to withhold shipment of goods unless the debtor caught up on unpaid invoices were customary in the pre-preference period), *and Levy v. Gatlin (In re Gardner Matthews Plantation Co.)*, 118 B.R. 384, 386 (Bankr. D.S.C. 1989) (finding a creditor's phone calls threatening to stop future sales in order to extract partial payment were normal and common occurrences).[9] The facts in *Miller v. Westfield Steel, Inc.* resemble the facts in the present case in that the debtor in *Miller* traditionally made payment about two (2) months after the invoice date, despite an agreement to pay within thirty (30) to forty-five (45) days from invoice. Additionally, the creditor attempted to collect on unpaid invoices by calling several times and threatening to withhold future shipment. Because the threats were made during the preference and pre-preference period, the bankruptcy court found

---

[9]In *Menotte v. Oxyde Chem. Inc.*, 424 B.R. 573, the court found that though the creditor routinely sent emails inquiring about payments, it did not routinely send emails indicating the debtor was placed on a "credit hold," and as such, an email restricting credit constituted unusual collection activity. In the present case, none of the emails sent by the Defendant to the Debtor mentioned being placed on COD terms. Other than inquiring about payment, the only mention the Defendant made concerning credit was to advise the Debtor that the Defendant's auditors would review account receivables and the Debtor should "stay off their list and in good standing." Ex. BB.

the creditor took "no unusual action in attempting to collect on unpaid invoices." *Miller v. Westfield Steel, Inc.*, 426 B.R. at 112.

In this case, it is clear that placing the Debtor's account on COD terms was within the ordinary course of business between the Debtor and the Defendant. On several occasions during the Baseline Period, the Defendant either placed the Debtor's account on COD terms or threatened to do so in attempt to collect on unpaid invoices. Such action was normal and customary between the parties. Further, the Court cannot find such action rises to the level of economic pressure recognized as being outside the ordinary course of business in cases where creditor action was extreme. *See Frank v. Volvo Penta of the Am. (In re Thompson Boat Co.)*, 199 B.R. 908 (Bankr. E.D. Mich 1996) (determining a creditor's attempts to reduce debt and enforce invoice terms by withholding shipment of goods were unprecedented in the parties' longstanding relationship); *XTRA, Inc. v. Seawinds Ltd. (In re Seawinds Ltd.)*, 91 B.R. 88 (Bankr. N.D. Cal. 1988) *aff'd,* 888 F.2d 640 (9th Cir. 1989) (disallowing the ordinary course of business exception where a creditor engaged in unusual collection activities by using economic pressure by terminating contracts and demanding immediate payment and return of equipment).

The Court can find no discernable adjustments to the manner in which the Defendant handled the Debtor's account between the Baseline and Preference Periods. Further, it appears the Defendant continued to extend credit to the Debtor despite rumors that the Debtor was contemplating filing a bankruptcy petition in February 2009. Ex. AA. Despite having this knowledge, there is no evidence to suggest the Defendant took advantage of the Debtor's deteriorating financial condition or used its position as the Debtor's remaining vendor to elicit payment from the Debtor. Finally, the Court notes the Defendant filed a claim in the Debtor's bankruptcy case in the amount of $455,784.16,

suggesting the Defendant continued to extend materials to the Debtor on credit up until the bankruptcy petition.[10]

Accordingly, as discussed above, the Transfers were made in the ordinary course of business pursuant to § 547(c)(2).[11] Upon review of all the evidence in the light most favorable to the Trustee, and after finding the the ordinary course defense applies, the Court finds no genuine issue of material fact exists and the Defendant is entitled to judgment as a matter of law. The Defendant's Motion is **GRANTED**. The Trustee's Motion is **DENIED**. The Trustee shall have and recover nothing of the Defendant. The Clerk of Court is directed to enter judgment accordingly.

**SO ORDERED.**

**END OF DOCUMENT**

---

[10] The Defendant filed unsecured claim number 336 in the amount of $455,784.16 on February 15, 2012. Both the Trustee and the Defendant stipulate the amount of new value extended by the Defendant to the Debtor pursuant to § 547(c)(4) was $91,466.67. This further evidences the Defendant's continued business relationship with the Debtor after the Transfers were made.

[11] To the extent that the ordinary course of business exception pursuant to § 547(c)(2)(A) applies, the Court need not examine whether the Transfers were made under ordinary business terms pursuant to § 547(c)(2)(B).